UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DESHANAE L. BROWN,

                Plaintiff,

      – against –

NEW YORK CITY HUMAN
RESOURCES ADMINISTRATION,
MOUSTAPHA BOUKARI, FRANK
AGBI, ASRA HORTON, LAURIE
MOORE, AND CANDI RUFUS,

                Defendants.

**OPINION & ORDER**

23-cv-09113 (ER)

RAMOS, D.J.:

Deshanae L. Brown, proceeding *pro se*, filed this action against her former employer—the New York City Human Resources Administration ("HRA")—and five former coworkers at the HRA:  Moustapha Boukari, Frank Agbi, Asra Horton, Laurie Moore, and Candi Rufus (collectively "the individual defendants").  Doc. 53.  She alleges that Defendants discriminated against her because of her color, sex, and disability in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act of 1990 ("ADA"), the Family and Medical Leave Act of 1993 ("FMLA"), and New York State Human Rights Law ("NYSHRL").

Before the Court is the motion to dismiss the amended complaint[1] pursuant to Federal Rule of Civil Procedure 12(b)(6) filed by HRA, Boukari, Horton, and Rufus.[2] For the reasons set forth below, the motion is GRANTED in part and DENIED in part, and the Court dismisses Brown's claims against Moore and Agbi *sua sponte*.

---

[1] Defendants moved to dismiss the "third amended complaint" and cite to Doc. 53 as the complaint they are seeking to dismiss.  Doc. 71 at 8.  But there is no third amended complaint.  Only one amended complaint has been filed—Doc. 53.

[2] HRA, Boukari, Horton, and Rufus are represented by the Corporation Counsel of the City of New York. Docs. 28, 36.  Moore and Agbi have not been served.

I.    **BACKGROUND**

A.  **Factual Background**

The complaint consists of a 25-page summary and a 71-page diary-style attachment that records incidents that occurred at the HRA from January 21, 2021, to May 8, 2024.[3]  Doc. 53.  Facts relevant to Brown's claims are summarized below.

Brown began to work for the HRA in 2016.  Doc. 53 at 11.  Her responsibilities included front desk customer service and client benefits processing.  *Id*.  She describes herself as "Native American [B]lack."  Doc. 53 at 12.

1.  *Hostility*

Brown claims that staff members at the HRA were hostile towards her.  For example, coworkers stared directly at her, raised their voice when they spoke to her, and made angry facial expressions towards her.  *Id*. at 11–15.  A tall coworker once stood so close to Brown's chair that she was almost standing over Brown's head.  *Id*. at 58.  Another coworker offered Brown candy every day for a whole month although she declined every time.  *Id*. at 68.  To resolve the hostility, Brown met with three of her co-workers on December 12, 2022, and informed them that she no longer wanted staff and management to speak to her unless it was necessary.  *Id*. at 76.  Brown also started to smell "a faint brut type of cologne" in January 2023.  *Id*. at 83–84.  The smell became stronger later and caused Brown to experience a burning sensation in her throat.  *Id*. at 84.  It was unclear to her whether it was Boukari, Ayesha, or the janitor that sprayed chemicals and caused the smell.  *Id*.

2.  *Brown's Color and Race*

In May 2018, when having a conversation about Prince Harry's wedding with Brown and a client, a fellow staff member, Bello, commented that Brown sounded like the royal family of England.  *Id*. at 11.  Brown felt insulted because she believed Bello

---

[3] The complaint is numbered in an incoherent manner.  In this opinion, the Court cites to the ECF page number, rather than the paragraph number, for clarity.  Brown also does not provide first and last names for many of her co-workers.  This Opinion includes the descriptive information she does provide.

was suggesting that she spoke like a White person. *Id.* A week later, Bello commented that Brown should not travel to Mecca because her dreadlocks would attract too many bugs. *Id.*

In October 2022, Brown, Moore, and "St. Paul," a superior of Brown, talked about Brown's ethnicity. *Id.* at 47. Brown considered herself "Native American Black" because Native Americans originate from Asia and her family came from Asia and Jamaica. *Id.* St. Paul then pulled out photos of Native Americans and started to talk about migrations. *Id.* Moore responded to Brown, "[Y]ou think you [are] White? They do not want anything to do with us!" *Id.* Moore added that she believed all Black people are from Africa. *Id.* Brown insisted that she was "Native American African." *Id.* Moore then told Brown that she could be "whatever color you want to be, blue, green." *Id.* Brown believes that staff at the HRA were hostile to her because the majority of them were dark-skinned. *Id.*

### 3. *Brown's Sexual Orientation*

Brown makes a number of allegations suggesting that her co-workers believed she was gay. For example, during her employment at the HRA, Roberts and Myrick spread rumors that Brown dated women. *Id.* at 18. In 2017, Moore "seemingly invited" Brown into a single occupancy restroom with her. *Id.* On December 6, 2019, Brown filed an internal complaint against Ivy Simpson, a coworker, for harassing her. *Id.* at 60–61. Approximately two and a half years later, on June 8, 2022, Agbi scheduled a meeting with Brown where he informed Brown that Simpson had also filed a complaint against Brown for sexually harassing her. *Id.* at 60. Specifically, Simpson alleged that Brown "made kissing faces towards her" and "shrugged her off." Doc. 74-2 at 3. Brown claimed that the allegations in the complaint were fabricated. Doc. 53 at 14. She confronted Simpson after the meeting and asked her why she had lied. *Id.* Simpson responded by threatening to "fuck [her] up." *Id.* Simpson and St. Paul filed a report with the police after the confrontation. *Id.* at 61.

3

### 4. *Brown's Health Situation*

Brown alleges that she suffered from PTSD, carpal tunnel syndrome, and a musculoskeletal disorder during her employment at the HRA. *Id*. at 5.

On June 10, 2022, when Brown exited the HRA building for lunch, a client, who she had never met, confronted her without provocation and stabbed her ankle twice with a four-inch blade. *Id*. at 15, 62. She believes that the client intended to "assassinate" her because the client dressed in purple and yellow, the color of NBA player Kobe Bryant, whose nickname was Black Mamba, which Brown alleges is a code for assassin. *Id*. Brown alleges that Agbi, Kesha Graham, Simpson, and Crawford planned the attack based on the tension between them. *Id*. at 62. Two days later, on June 12, Brown submitted a request to work from home until January 18, 2023 to the office of equal employment opportunities ("EEO") as an accommodation for the post-traumatic stress disorder ("PTSD") she developed as a result of the attack. *Id*. at 63, 65. The EEO office requested that a physician certification form be filled out despite the fact that Brown had submitted a letter from her primary care doctor stating that her PTSD caused her to become unnerved inside HRA facilities. *Id*. But Brown had a difficult time finding a doctor who was willing to fill out the form for her. *Id*. at 64. One day, Choden Tenzin, whom Brown does not further describe, referred Brown to therapists who were able to conduct a PTSD assessment but Brown declined because "she was already settling into working." *Id*. at 64–65.

On July 8, 2022, Brown was informed that she was being temporarily relocated to the Concourse center in the Bronx, another location of the HRA. *Id*. at 64. Brown refused because she was concerned about her mental health and personal safety in the Bronx. *Id*. The HRA then relocated her to the Manhattan center. *Id*. at 65. Brown appeared to be unsatisfied with the relocation and reminded the HRA that her PTSD caused her to become unnerved inside any HRA facility. *Id*.

4

On July 20, 2022, Brown applied for intermittent FMLA, which would allow her to take leave in separate blocks of time, but was denied because she was injured on the job and thus not qualified for FMLA leave. *Id*. at 103. Brown was advised to apply for workers' compensation benefits. *Id*.

On July 28, 2022, Brown was informed that her work from home request was denied. *Id*. at 65. Rita Concepcion told her that she would not be able to perform her job duties from home. *Id*. Brown claimed that she worked from home during the COVID-19 pandemic and performed all her duties. *Id*.

In March 2023, Brown began to experience a burning sensation at her desk. *Id*. at 17, 18. She believed the heat came from the floor because the tiles beneath her desk had "suspicious skid marks that look[ed] like heat waves." *Id*. at 17. In addition, her anxiety was "out of control" because a high volume of staff passed by and stared at her. *Id*. Accordingly, she obtained a letter from her doctors, requesting her seat be changed. *Id*. at 19. She refused to go to work because of the heat issue and was "writ[ten] up[]" because of the absence. *Id*. A week and half later, her seat was changed. *Id*. But the light above her new seat was lower in height and brighter than the one above her prior seat, causing her so much pain that she had to leave work before 1 p.m. each day. *Id*. On March 23, 2023, the air conditioning above Brown's desk started to pour out cold air. *Id*. at 89. It was not fixed until four days later. *Id*. at 92. Brown believed the cold air was a part of HRA's "manipulation[]" against her. *Id*. at 94.

Brown often video-recorded herself with her phone in the office because she believed the office was "dangerous." *Id*. at 93–94. On March 29, 2023, Rufus, her superior, claimed that Brown was recording her fellow staff members and called security. *Id*. at 93. Rufus also demanded Brown give over her phone. *Id*. After the incident, Brown was sent home by Rufus. *Id*. On April 3, Brown returned to work and recorded herself again. *Id*. at 94. The next day, she was placed on involuntary leave for two weeks because of the recent complaints against her. *Id*. When she returned to work on April 18,

she recorded herself once again and was told to stop recording. *Id*. at 95. She argued with HRA management about recording and was placed on two-week involuntary leave again on April 20. *Id*. at 97. On May 3, she was "involuntarily sent" to a session with therapist Dr. Burnstein. *Id*. Dr. Burnstein concluded that Brown "would have no problems performing [her] duties outside of [her] usual work setting." *Id*. at 98. On May 12, "[s]omeone" submitted an accommodation request for Brown, requesting that she work from home for religious reasons. *Id*. at 97. Brown believes a manager made the request on her behalf because only managers have such authority. *Id*.

On May 15, the HRA started the process of terminating Brown. *Id*. at 97. An Office of Administrative Trials and Hearings ("OATH") proceeding was held from June 7 to June 21 to determine if Brown should be terminated. *Id.* at 99.

On June 28, Brown was selected to be a part of a pilot program, which allows employees to work from home two days a week. *Id*. at 101. But there were frequent technical issues with the laptop provided by the HRA. *Id*. at 102. Brown was required to come into the office every time such technical issue occurred. *Id*. On August 26, 2023, Brown submitted another request to work from home. *Id*. She claimed that she often experienced a burning sensation over her entire body. *Id*. at 21. In September, she was diagnosed with carpal tunnel syndrome. *Id*.

On October 6, 2023, OATH issued an opinion finding that the HRA should repay Brown for the second involuntary leave and advised the HRA to communicate with Brown to accommodate her remote work request. *Id*. at 99. Meanwhile, Dr. Lomita, a hand orthopedic specialist, refused to provide Brown with a letter recommending that she work from home due to her carpal tunnel syndrome, because the syndrome does not hinder an individual's ability to commute. *Id*. On October 17, however, Brown obtained

a letter from Dr. Chan, recommending Brown work from home for a month.[4]  *Id*.  But Brown asserts she was no longer able to work after October 16 because of her health situation.  *Id*. at 100.  As a result, when the EEO office contacted her about her request to work from home, she informed them that she could not work.  *Id*.  The HRA and Brown started to talk about long-term leave.  *Id*.

On November 9, 2023, Dr. Lomita completed a physician certification form for Brown, recommending that she return to office and that the HRA provide her with ergonomic equipment.  *Id*. at 103.  Dr. Chan completed another physician certification form on December 1, 2023, retroactively recommending her leave from October 27, 2023 to November 20, 2023.  *Id*.  Chawna Chatman, from the HRA FMLA unit, approved Brown's leave request from October 27, 2023 to November 20, 2023 but refused to provide longer leave.[5]  *Id*.  On March 19, 2024, Brown obtained a doctor's letter recommending that she be placed on leave until further notice.  *Id*. at 104.  She forwarded the letter to Chatman, who provided a leave of absence letter to the disability unit of Local 371, of which she was a member, on May 24, 2024.  *Id*.  The first disability check from Local 371 was mailed to Brown on May 28, 2024.  *Id*.  In July 2024, Brown "tried to return to work."  *Id*. at 26.  Chatman stopped responding to her requests in August 2024.[6]  *Id*.

### B.  Procedural Background

On March 30, 2023, Brown filed a charge with the U.S. Equal Employment Opportunity Commission ("EEOC")[7] and checked the box for color and race

---

[4] Separately, Brown also alleges that Dr. Chan completed a physician certification form on December 1, 2023 and recommended her leave from October 27, 2023 to November 20, 2023.  Doc. 53 at 103.  It is unclear whether Dr. Chan recommended her work from home, leave, or both.

[5] Brown claims that Chatman approved her October 2023 leave on April 17, 2024.  Doc. 53 at 103.

[6] Brown does not allege whether or when she was terminated.  She also does not allege whether or when her request to return to work was approved.

[7] Defendants allege that Brown filed the EEOC charge on April 18, 2023.  Doc. 71 at 16.  In the memorandum in opposition, Brown alleges that she filed the charge on March 20, 2023.  Doc. 68 at 4.  The

discrimination on the complaint form. Doc. 68 at 4; Doc. 74-2.[8] On the form, when she describes the discrimination, she alleges that her coworkers discriminated against her based on her race, color, and sex. Doc. 74-2 at 2. Among other things, her coworkers stared at her, turned up the air conditioner to make her sick for three days, and sprayed chemicals in the air causing her throat to burn. *Id*. Brown received the right-to-sue letter on August 29, 2023. *Id*. She filed the initial fifteen-page complaint in this action on October 13, 2023, alleging claims pursuant to Title VII, the ADA, FMLA, and NYSHRL. Doc. 1. She was granted leave to proceed *in forma pauperis* on October 18, 2023. Doc. 4. In December 2023, the U.S. Marshals served the complaint and summons on all Defendants. Docs. 14–19. Boukari, Horton, and Rufus returned acknowledgments of receipt. Docs. 22–24. Brown filed a second EEOC charge on November 14, 2024, which includes allegations of disability discrimination and retaliation. Doc. 68 at 4; Doc. 74-1 at 2.

Brown filed an amended complaint on February 18, 2025. Doc. 53. In addition to the charges in the initial complaint, she alleges disability discrimination based on her PTSD. Doc. 53. She received the right-to-sue letter for her second EEOC charge on March 31, 2025, which indicates that the charge was dismissed because she filed a federal lawsuit against the respondents of her EEOC charge. Doc. 64-1.

---

Court accepts as true all of Brown's factual allegations at the motion to dismiss stage. *See Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013) ("A district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion."); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (holding that courts must accept as true all factual allegations in the complaint).

[8] Defendants attach Brown's first EEOC complaint to their reply memorandum. Doc. 74-2. In determining a motion to dismiss, courts may consider plaintiff's relevant filings with the EEOC, even if the filings are submitted to the court by the defendant, because they are integral to the complaint. *Holowecki v. Federal Express Corporation*, 440 F.3d 558, 565 (2d Cir. 2006) ("In reviewing the Rule 12(b)(6) ruling, it is proper for this court to consider the plaintiff['s] relevant filings with the EEOC ..., none of which were attached to the complaint, because the ... plaintiffs[] rely on these documents to satisfy the ADEA's time limit requirements."), aff'd, 552 U.S. 389, 128 S. Ct. 1147, 170 L. Ed. 2d 10 (2008); *Gates v. City of New York*, No. 20-cv-3186 (JPC), 2021 WL 3774189, at *1 (S.D.N.Y. Aug. 25, 2021) (considering plaintiff's EEOC charge because it is integral to the complaint).

On June 18, 2025, the HRA, Boukari, Horton, and Rufus first filed a motion to "dismiss the [t]hird [a]mended [c]omplaint," which was rejected by the Clerk of Court for filing error.  Doc. 67.  Brown filed an opposition to the motion to dismiss on July 11, 2025.  Doc. 68.  The HRA, Boukari, Horton, and Rufus refiled the motion to dismiss on July 28, 2025, Docs. 70, 71, 72, and filed the memorandum in reply on August 1.  Doc. 73.

## II.  LEGAL STANDARD

### A.  Rule 12(b)(6)

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  The Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  If the plaintiff has not "nudged [her] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 680.

The same standard applies to motions to dismiss in cases brought by *pro se* plaintiffs.  *Davis v. Goodwill Industries of Greater New York & New Jersey, Inc.*, 2017 WL 1194686, at *5 (S.D.N.Y. 2017) (citing *Zapolski v. Federal Republic of Germany*, 425 F. App'x 5, 6 (2d Cir. 2011)).  The Court remains obligated to construe a *pro se* complaint liberally, and to interpret a *pro se* plaintiff's claims as "rais[ing] the strongest

arguments that they suggest." *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 474 (2d. Cir. 2006) (citing *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)).  Nevertheless, "*pro se* status 'does not exempt a party from compliance with relevant rules of procedural and substantive law.'" *Triestman*, 470 F.3d at 477 (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).  To survive a motion to dismiss pursuant to Rule 12(b)(6), a *pro se* plaintiff's pleadings still must contain "more than an unadorned, the defendant-unlawfully-harmed me accusation." *Iqbal*, 556 U.S. at 678.  A *pro se* complaint that "tenders naked assertion[s] devoid of further enhancement" will not suffice.  *Id.* (internal quotations omitted) (quoting *Twombly*, 550 U.S. at 557).

### B.  28 U.S.C. § 1915(e)(2)

A district court must dismiss *in forma pauperis* action *sua sponte* if it determines that the action is frivolous or malicious, fails to state a claim, or seeks monetary relief against a defendant who is immune from such relief.  28 U.S.C. § 1915(e)(2).  "An action is frivolous when either: (1) the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (internal citation and quotation marks omitted).

### III.   DISCUSSION

#### A.  Abandonment

Defendants argue that the claims for disability and gender discrimination, the ADA and Title VII claims against Boukari, Horton, and Rufus, and the FMLA claim should be dismissed because Brown failed to respond to Defendants' arguments regarding these claims in her memorandum in opposition to the motion and should thus be deemed to have abandoned these claims.  Doc. 73 at 6.  Defendants cite *Williams v. Mirabal*, No. 11-cv-366 (JMF), 2013 WL 174187 (S.D.N.Y. Jan. 16, 2013) to support this argument. *Id*.  But courts in this district generally decline to dismiss a *pro se* plaintiff's claims based on abandonment, even if the plaintiff fails to respond to the defendant's arguments for

10

dismissal. *See e.g.*, *Rosen v. N.Y.C. Department of Education*, No. 18-cv-6670 (AT), 2019 WL 4039958, at *3 (S.D.N.Y. Aug. 27, 2019); *Pell v. Yonkers City School District*, No. 23-cv-10398 (NSR), 2025 WL 2084739, at *3 (S.D.N.Y. July 24, 2025). The case cited by Defendants, despite also involving a *pro se* plaintiff, is inapposite. In *Williams*, the plaintiff moved to amend the complaint after the defendant filed a motion to dismiss but the plaintiff never made any further filings with the court and could not be reached ever again after the court granted him the opportunity to replead. *Williams*, 2013 WL 174187, at *1. In the present case, Brown is actively litigating the case and filed an opposition to the motion to dismiss. Doc. 68. Accordingly, the Court will consider all of Brown's claims.

### B. Procedural Bar

Defendants argue that Brown's ADA claim should be dismissed because she did not exhaust her administrative remedies regarding this claim with the EEOC. Doc. 71 at 14. The Court agrees.

Before filing an ADA claim in the federal court, a plaintiff must file an EEOC charge to present the basis of the lawsuit and obtain a right-to-sue letter. *D'Cunha v. Northwell Health System*, No. 22-cv-0988 (MKV), 2023 WL 2266520, at *5 (S.D.N.Y. Feb. 28, 2023), *aff'd*, No. 23-476-cv, 2023 WL 7986441 (2d Cir. Nov. 17, 2023); *Littlejohn v. City of New York*, 795 F.3d 297, 322 (2d Cir. 2015). But a claim not raised in the EEOC complaint may still be part of the later filed lawsuit in the federal court if the claim is "reasonably related" to the claims filed with the EEOC. *Littlejohn*, 795 F.3d at 322. An unasserted claim is reasonably related to claims in an EEOC charge if the unasserted claim: (1) "would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination;" (2) alleges retaliation for filing an EEOC charge; or (3) alleges incidents of discrimination carried out in precisely the same manner as those alleged in the EEOC charge. *Terry v. Ashcroft*,

11

336 F.3d 128, 151 (2d Cir. 2003); *Doolittle v. Bloomberg L.P.*, No. 22-cv-09136 (JLR), 2023 WL 7151718, at *5 (S.D.N.Y. Oct. 31, 2023).

Brown failed to obtain a right-to-sue letter for her disability discrimination claim before she filed an ADA claim with the federal court.  Her first EEOC charge, filed on March 30, 2023, only checked the box for color and race discrimination on the form. Doc. 74-2 at 2.  She did not file a disability discrimination charge with the EEOC until November 14, 2024, after initiating the instant action, which includes an ADA claim. Doc. 1.  She filed the amended complaint on February 18, 2025, approximately a month before she received the right-to-sue letter for her disability discrimination on March 31, 2025.  Doc. 64.  But "[p]ost-filing administrative development cannot retroactively cure a failure to exhaust and are not grounds for permitting a prematurely filed action to continue in federal court."  *Islam v. Steiner*, No. 24-cv-10064 (DEH), 2026 WL 589600, at *9 (S.D.N.Y. Mar. 2, 2026) (dismissing the Title VII claim because the plaintiff only submitted a formal EEO or EEOC complaint after commencing his federal action).  The fact that Brown eventually received a right-to-sue letter for her disability discrimination claim does not cure the failure to exhaust in her already filed federal litigation.

In addition, Brown's disability discrimination claim is not reasonably related to her first EEOC charge because she referenced no facts concerning discrimination based on her disability or even her disability itself in the first EEOC complaint.  Doc. 72-2 at 2– 3.  *Littlejohn*, 795 F.3d at 322 (affirming dismissal of the plaintiff's sexual harassment claim as unrelated to her race and color discrimination claims because she neither claimed discrimination based on sex nor referenced any of the alleged acts of sexual harassment in her original EEOC charge); *Rusis v. International Business Machines Corp.*, 529 F. Supp. 3d 178, 204 (S.D.N.Y. 2021) (dismissing an ADEA claim because the plaintiff alleged only race and national origin discrimination in his EEOC charge and alleged no facts concerning any discrimination based on his age).  Indeed, Brown acknowledges that she "deliberately excluded" allegations about the HRA's failure to

provide her with reasonable accommodation for the attack on June 10, 2022 from her EEOC charge, and that the rest of the HRA actions concerning her disability mostly occurred after she filed her first EEOC complaint. Doc. 68 at 4. Accordingly, Brown's ADA claim is dismissed for failure to exhaust administrative remedies.

### C. Timeliness

Defendants argue that Brown's Title VII claims relying on events that occurred before June 22, 2022 are time-barred, based on their calculation that she filed the EEOC complaint on April 18, 2023. Doc. 71 at 16. Before filing a Title VII employment discrimination action in New York federal courts, a plaintiff must first file a complaint with the EEOC within 300 days of the underlying incidents. *Rowe v. New York State Department of Taxation and Finance*, 786 F. App'x 302, 304 (2d Cir. 2019). Brown filed her first EEOC complaint on March 30, 2023. Accordingly, events that occurred 300 days prior to the EEOC complaint, which is June 3, 2022, based on Brown's allegation that she filed the EEOC complaint on March 20, 2023, are time-barred and not actionable. But these events can still be considered as evidence of discriminatory motivation in support of a timely discrimination claim. *McConkey v. Churchill School & Center*, No. 24-cv-6091 (LJL), 2025 WL 2062195, at *8 (S.D.N.Y. July 23, 2025); *Hodges v. Sessions*, No. 17-cv-4273 (RA), 2018 WL 4232918, at *3 (S.D.N.Y. Sept. 5, 2018).

Defendants also argue that Brown's NYSHRL claims relying on events that occurred prior to October 13, 2020 are time-barred. Doc. 71 at 16. The Court agrees. NYSHRL claims are subject to a three-year statute of limitation. *Samuels v. City of New York*, No. 22-cv-1904 (JGK), 2023 WL 5717892, at *6 (S.D.N.Y. Sept. 5, 2023). Brown initiated the instant action on October 13, 2023, so events occurred prior to October 13, 2020 are not actionable.

But the Court may consider these time-barred events in connection with Brown's hostile work environment claims pursuant to Title VII and the NYSHRL, if they are part

13

of the same unlawful employment practice and at least one of such action falls within the time period. *Id*. at \*5–\*6.

### D. Failure to State a Claim

#### 1. The FMLA Claim

The Second Circuit has recognized two types of FMLA claims—interference claims and retaliation claims. *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004); *Smith v. Westchester County*, 769 F. Supp. 2d 448, 463 (S.D.N.Y. 2011). To state an FMLA interference claim, a plaintiff must plead that: (1) she is an eligible employee under the FMLA; (2) the defendant is an employer as defined in the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave notice to the defendant of her intention to take leave; and (5) she was denied benefits to which he was entitled under the FMLA. *Smith*, 769 F. Supp. 2d at 465. Interference with the exercise of an employee's FMLA rights includes not only denial of FMLA leave but also discouraging an employee from using such leave. *Haran v. Orange Business Services, Inc.*, 160 F.4th 51, 56 (2d Cir. 2025).

Defendants argue that Brown fails to state an FMLA interference claim because she does not allege that the HRA interfered with, restrained, or denied the exercise of her FMLA rights. Doc. 71 at 18. The Court disagrees. Brown requested FMLA leave twice. She requested: (1) intermittent leave on July 20, 2022, following the stabbing incident; and (2) leave from October 27, 2023 to November 30, 2023. Doc. 53 at 103. As Defendants acknowledge, the later request was approved. Doc. 71 at 18. But Defendants fail to address the 2022 request. After Brown applied for FMLA leave in 2022, the HRA informed her that she did not qualify for the FMLA because she was injured on the job and should apply for workers' compensation benefits instead. Doc. 53 at 103. But a workers' compensation absence and FMLA leave can run concurrently. 29 C.F.R. § 825.702(d)(2) ("An employee may be on a workers' compensation absence due to an on-the-job injury or illness which also qualifies as a serious health condition under

FMLA. The workers' compensation absence and FMLA leave may run concurrently."); *Rodriguez v. Atria Senior Living Group, Inc.*, 887 F. Supp. 2d 503, 517 (S.D.N.Y. 2012) (same). Therefore, Defendants' motion to dismiss is denied as regard to Brown's FMLA interference claim.

However, Brown fails to state an FMLA retaliation claim because she fails to plausibly allege an adverse employment action. To prevail on an FMLA retaliation claim, a plaintiff must show that: (1) she exercised rights protected under the FMLA; (2) she was qualified for her position; (3) she was subjected to an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. *Id.* at 58–59. In terms of the 2022 FMLA request, there is no adverse employment action that can plausibly be seen as a retaliatory act. In terms of the 2023 FMLA request, Brown alleges that the HRA refused to grant her a leave longer than the October 27 to November 30, 2023 period, which was recommended by her doctor. Doc. 53 at 103. But refusing to extend the FMLA leave for a period longer than that recommended by the employee's doctor does not constitute an adverse action in retaliation for requesting the FMLA in the first place. *See Murray v. City of New York*, No. 23-cv-10031 (PAE), 2024 WL 3553266, at *14 (S.D.N.Y. July 26, 2024) (holding that denial of an FMLA request for leave cannot constitute an adverse action taken in retaliation for the request itself); *Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 166 (2d Cir. 2017) (distinguishing FMLA interference claims and retaliation claims, and holding that interference claims involve preventing or impeding an employee's ability to exercise her FMLA rights and retaliation claims "involve an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA"). To the extent that Brown alleges the denial of extension was an act in retaliation for her FMLA request on July 20, 2022, she fails to plausibly allege any facts giving rise to the inference of retaliatory intent. Accordingly, Brown fails to state an FMLA retaliation claim.

2. *Color and Race Discrimination*

a. *Title VII*

Title VII prohibits employers from discriminating against any individual with respect to their compensation, terms, conditions, or privileges of employment, because of such individual's race and color. 42 U.S.C. § 2000e-2(a)(1). To state a claim for discrimination under Title VII, a plaintiff must allege: (1) membership in a protected class; (2) qualification for the position held; (3) an adverse employment action; and (4) that the circumstances surrounding that action give rise to an inference of discrimination. *Mumin v. City of New York*, 760 F.Supp.3d 28, 53 (S.D.N.Y 2024); *Weinstock v. Columbia University*, 224 F.3d 33, 42 (2d Cir. 2000).

Defendants argue that Brown fails to plausibly allege an inference of color and race discrimination. Doc. 71 at 20. The Court agrees. An inference of discrimination can be drawn from disparate treatment, or actions or remarks reflecting discriminatory animus of decisionmakers. *Chertkova v. Connecticut General Life Insurance Co.*, 92 F.3d 81, 91 (2d Cir. 1996); *see also Salas v. New York City Department of Investigation*, 298 F. Supp. 3d 676, 687 (S.D.N.Y. 2018). For example, circumstances giving rise to an inference of discrimination can include the employer's criticism of the plaintiff's performance in ethnically degrading terms, its invidious comments about others in the employee's protected group, the more favorable treatment of employees not in the protected group, or the sequence of events leading to the plaintiff's discharge. *Littlejohn*, 795 F.3d at 312.

Here, in May 2018,[9] a staff member, Bello, commented that Brown spoke like the royal family of England. Doc. 53 at 11. A week later, Bello also stated that Brown should not travel to Mecca because her dreadlocks would attract too many bugs. *Id*. In October 2022, in response to Brown's statement that she self-identified as "Native

---

[9] Bello's statements are not actionable because any Title VII discrimination claims based on these statements would be time-barred as discussed above. But these comments can still be considered as evidence of discriminatory motivation in support of a timely discrimination claim. *McConkey*, 2025 WL 2062195, at *8; *Hodges*, 2018 WL 4232918, at *3.

American Black" instead of African American because her family did not originate from Africa, Moore stated that all Black people are from Africa and was surprised that Brown thought she was White, because "[t]hey [do not] want anything to do with [people like Moore and Brown]." *Id*. at 47. Moore also added that Brown can be whatever color she wanted, blue or green. *Id*. "St. Paul," a superior of Brown, also pulled out photos of Native Americans and talked about migration after Brown's statement. *Id*. But these comments, without more, are stray remarks that do not constitute evidence of discrimination. *Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) (holding that without more, stray remarks, even if made by a decision maker, do not constitute sufficient evidence to support a case of employment discrimination); *Moore v. New York City Transit Authority*, No. 16-cv-69 (LDH) (CLP), 2023 WL 2667000, at *6 (E.D.N.Y. Mar. 28, 2023) (same). When determining the probative value of stray remarks, courts look to four factors: (1) who made the remark, a decision-maker, a supervisor, or a low-level co-worker; (2) the time the remark was made in relation to the adverse employment decision at issue; (3) whether the remark can be reasonably viewed as discriminatory; and (4) whether the remark was made during a decision-making process. *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 112 (2d Cir. 2019). The Court concludes that these comments are stray remarks that do not plausibly give rise to an inference of discrimination. None of the comments described above are alleged to have been made during a decision-making process or by a decision-maker. *Lively v. WAFRA Investment Advisory Group, Inc.*, 6 F.4th 293, 306 (2d Cir. 2021) (holding that stray remarks are insufficient to raise an inference of discriminatory motive unless they were made repeatedly, drew direct link between the discriminatory stereotypes and the adverse employment decisions, and were made by a decision-maker); *Levy v. NYC Health + Hospitals*, 660 F. Supp. 3d 220, 232 (S.D.N.Y. 2023) (finding that although one of plaintiff's supervisors repeatedly used racial slurs in the days leading up to the plaintiff's termination, the slurs do not give rise to an inference of discrimination because the plaintiff did not connect the slurs with the

17

termination).  Accordingly, Brown's color and race discrimination claim pursuant to Title VII is dismissed.

### b. The NYSHRL

Brown also alleges discrimination pursuant to the NYSHRL.  Doc. 53 at 5.  To state a claim for race discrimination under the NYSHRL, plaintiffs need only to show that they were treated less well because of their race.  *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (clarifying the standard for discrimination under the NYCHRL); *Mumin*, 760 F.Supp.3d at 55 (holding that after the 2019 amendment, the NYSHRL adopts the same lenient standard as the NYCHRL).  Unlike Title VII, a plaintiff can satisfy the requirements of the NYSHRL by showing differential treatment of any degree, and a materially adverse employment action is not required.  *Gorokhovsky v. New York City Housing Authority*, 552 F. App'x 100, 102 (2d Cir. 2014) (summary order).  But, as under Title VII, a plaintiff must still allege facts sufficient to support an inference that race is a motivating factor for the inferior treatment.  *Bell v. McRoberts Protective Agency, Inc.*, No. 15-cv-0963 (JPO), 2016 WL 7192083, at *5 (S.D.N.Y. Dec. 12, 2016).

Here, Brown fails to plausibly demonstrate circumstances giving rise to an inference of race discrimination pursuant to the NYSHRL.  Stray remarks, without more, do not give rise to an inference of discrimination even pursuant to the more lenient NYSHRL.  *Etienne v. MTA New York City Transit Authority*, 223 A.D.3d 612, 613 (1st Dep't 2024); *Sedhom v. SUNY Downstate Medical Center*, 201 A.D.3d 536, 537 (1st Dep't 2022).  For similar reasons as discussed above, the comments of Bello, Moore, and St. Paul do not give rise to an inference of race discrimination.  Accordingly, Brown's race discrimination claim pursuant to the NYSHRL is dismissed.

### 3. Sex Discrimination

Brown alleges that she was discriminated against because of her sex and perceived sexual orientation in violation of Title VII and the NYSHRL.  Specifically, she

18

alleges that two coworkers spread a rumor that she dates women, and Moore "seemingly" invited her to a single occupancy restroom with her. *Id.* at 18. Moreover, Brown was investigated for a female coworker's complaint that Brown "made kissing faces towards her" and "shrugged her off." Doc. 74-2 at 2–3. Discrimination on the basis of perceived sexual orientation is prohibited under Title VII and the NYSHRL. *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 122 (2d Cir. 2018) (Title VII); *Small v. New York City Department of Education*, 650 F. Supp. 3d 89, 97 (S.D.N.Y. 2023) (Title VII and NYSHRL). However, Defendants argue that Brown fails to allege sufficient facts to plausibly support an inference of discrimination based on her sex or sexual orientation. The Court agrees.

    *a. Title VII*

Being perceived to be homosexual, standing alone, is insufficient to support an inference of discrimination; a plaintiff also has to show that she was subjected to an adverse employment action. *Small*, 650 F. Supp. 3d at 98 (holding that the plaintiff, a teacher who was perceived to be gay by his coworkers, met his burden of showing an inference of discrimination by alleging that the principal told two parents that he disliked the plaintiff because he was gay three months prior to plaintiff's termination); *Rohn Padmore, Inc. v. LC Play Inc.*, 679 F. Supp. 2d 454, 461 (S.D.N.Y. 2010) (finding an inference of discrimination based on perceived sexual orientation when the plaintiff received an email stating that the company had to terminate him because of his sexuality).

To the extent that Brown argues that the HRA's investigation against her gives rise to an inference of discrimination, the Court concludes that the mere investigation of Brown pursuant to another employee's complaint does not constitute evidence of discrimination, especially when no consequence was imposed on her as a result of the investigation. *See Dixon v. City of New York*, No. 03-cv-343 (DLI) (VVP), 2008 WL 4453201, at *13 (E.D.N.Y. Sept. 30, 2008) (holding that mere commencement of

investigation into the plaintiff pursuant to another employee's complaint does not constitute retaliatory conduct because otherwise, an employer would be essentially prevented from investigating a complaint against an employee who engaged in protective activities).  To the extent that Brown argues that the coworker falsely accused her of sexual harassment out of discriminatory intent, she fails to connect the false accusation to any adverse employment action.  *Williams v. Breaking Ground House Development Fund Corp.*, No. 22-cv-8715 (LTS), 2023 WL 2143672, at *3 (S.D.N.Y. Feb. 17, 2023) (finding no inference of sex discrimination when the plaintiff simply alleged that he was terminated after being falsely accused of sexual harassment).

The comments of coworkers are at most stray remarks that do not constitute evidence of discrimination based on perceived sexual orientation because they are not alleged to be made by decision-makers or in relation to the decision maker process of an adverse employment action.  *See Lively*, 6 F.4th at 306.  Although discriminatory remarks cannot be deemed "stray" when other indicia of discrimination are properly presented, no other evidence of discrimination is presented here because mere commencement of an investigation against Brown does not constitute sex discrimination.

   b.  *The NYSHRL*

The NYSHRL similarly requires a plaintiff alleging sex discrimination to plead facts that plausibly give rise to an inference of sex discrimination.  *Bautista v. PR Gramercy Square Condominium*, 642 F. Supp. 3d 411, 428 (S.D.N.Y. 2022) (quoting *Wilson v. JPMorgan Chase Bank, N.A.*, No. 20-cv-4558 (JMF), 2021 WL 5179914 (S.D.N.Y. Nov. 8, 2021)).  As discussed above, stray remarks, without more, do not constitute evidence of discrimination pursuant to the NYSHRL.  *Etienne*, 223 A.D.3d at 613 (1st Dep't 2024); *Sedhom*, 201 A.D.3d at 537.  For similar reasons as discussed above, the commencement of the investigation and the coworker's comments about Brown's sexuality do not plausibly establish that she was treated less well *because of* her sex or sexual orientation.  *See e.g.*, *Roenick v. Flood*, No. 20-cv-7213 (JPC), 2021 WL

2355108, at *6 (S.D.N.Y. June 9, 2021) (finding no inference of discrimination based on sexual orientation pursuant to the NYSHRL when plaintiff's superior commented that another employee "is gay and can say whatever"); *Sanderson v. Leg Apparel LLC*, No. 19-cv-08423 (GHW), 2020 WL 3100256, at *10 (S.D.N.Y. June 11, 2020) (finding inference of discrimination based on plaintiff's perceived sexual orientation pursuant to the NYSHRL when his superior asked him whether his client was his boyfriend and laughed with other coworkers for multiple times when plaintiff reported his work with this client).

### 4. *Disability Claims Pursuant to the NYSHRL*

Brown alleges that she was discriminated against based on her disabilities in violation of the NYSHRL.  Specifically, she alleges that she suffered from PTSD, carpal tunnel syndrome, and a musculoskeletal disorder.  Doc. 53 at 5.  Defendants argue that Brown fails to plausibly state that she was disabled under the NYSHRL.  Moreover, to the extent that Brown alleges discrimination based on the denial of her accommodation request, she fails to state that she was denied reasonable accommodation because the accommodation she requested, remote work, was unreasonable due to the essence of her job responsibilities.  Doc. 71 at 20–23.

### a. *Disability Status*

Defendants argue that Brown was not disabled within the meaning of the NYSHRL.  Doc. 71 at 22–23.  The Court disagrees.  Under the NYSHRL, a disability is a condition that either:  "(1) prevents the exercise of a normal bodily function or (2) is demonstrable by medically accepted clinical or laboratory diagnostic techniques."  *Levine v. Smithtown Center School District*, 565 F. Supp. 2d 407, 428 (E.D.N.Y. 2008) (internal quotation marks omitted).  This definition "covers a range of conditions varying in degree from those involving the loss of a bodily function to those which are merely diagnosable medical anomalies which impair bodily integrity and thus may lead to more serious conditions in the future."  *Treglia v. Town of Manlius*, 313 F.3d 713, 723 (2d Cir. 2002).

Any "medically diagnosable impairment" would constitute an actionable disability pursuant to the NYSHRL. *Attis v. Solow Realty Development Co.*, 522 F. Supp. 2d 623, 631 (S.D.N.Y. 2007).

Defendants argue that Brown was not disabled under the NYSHRL because she was able to cycle, walk, and work one to two days a week. Doc. 71 at 22–23. But the NYSHRL does not require a disability to impair "major life activities," as the ADA does. *Devany v. United Parcel Service, Inc.*, No. 18-cv-6684 (PGG), 2021 WL 4481911, at *11 (S.D.N.Y. Sept. 30, 2021*); McCowan v. HSBC Bank USA, N.A.*, 689 F. Supp. 2d 390, 402 (E.D.N.Y. 2010). The fact that Brown was able to work in a limited capacity, standing alone, does not make her disability non-cognizable under the NYSHRL. *See McCowan*, 689 F. Supp. 2d at 402 (holding that a reasonable jury could find the plaintiff's depression is a disability within the meaning of the NYSHRL, although her doctor stated that she was able to work). Brown plausibly pleads that she suffered from disabilities by showing that she was diagnosed with carpal tunnel syndrome, Doc. 53 at 21, and her primary care doctor believed that she was suffering from PTSD that caused her to become unnerved at HRA facilities, *Id*. at 65. *See e.g.*, *Koonce v. Whole Foods Market Group, Inc.*, No. 22-cv-10418 (VB), 2023 WL 8355926, at *1, *4 (S.D.N.Y. Dec. 1, 2023) (finding disability under the NYSHRL when the plaintiff alleged that he suffered from diabetes that caused him to urinate more frequently and urgently than average persons); *Hughes v. City of New York*, No. 20-cv-3341 (AMD)(RLM), 2021 WL 7542440, at *4, *7 (E.D.N.Y. Aug. 25, 2021) (finding disability within the meaning of the NYSHRL when the plaintiff alleged that she suffered from PTSD but did not show how the condition limited a major life activity).

b. *Failure to Accommodate*

Brown made five accommodation requests. On June 12, 2022, she requested to work remotely until January 18, 2023 for her PTSD but was denied because she could not fulfill her job responsibilities remotely. Doc. 53 at 65. On July 20, 2022, she requested

intermittent FMLA leave and was told that on-the-job injury does not qualify for FMLA leave. *Id.* at 103. In March 2023, she requested a seat change because she felt a burning sensation at her original seat, which was approved. *Id.* at 17. In August 2023, she requested to work from home.[10] *Id.* at 102. After October 16, 2023, the HRA EEO office contacted Brown about her request to work from home. *Id.* at 100. However, Brown informed them that she no longer needed the accommodation because she could not work at all. *Id.* She stopped working on October 16, 2023. *Id.* at 104. She requested long-term leave in October 2023 and provided the HRA with Dr. Chan's letter recommending leave from October 27 to November 30, 2023. *Id.* at 103. On April 17, 2024, this long-term leave request was approved as an FMLA leave but only for the period advised by Dr. Chan. *Id.* The HRA refused to approve her leave for the period October 16 to October 26, 2023, or from December 1, 2023 onward. *Id.* at 104.

To establish a prima facie case for failure to accommodate pursuant to the NYSHRL, a plaintiff must allege: (1) she is a person with a disability within the meaning of the NYSHRL; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, she could perform the essential functions of her job; and (4) the employer denied the accommodation. *Koonce*, 2023 WL 8355926, at *5. Once the plaintiff establishes that a facially reasonable accommodation exists, "the burden shifts to the defendant to rebut the reasonableness of the proposed accommodation, which is in essence equivalent to the burden of showing, as an affirmative defense, that the proposed accommodation would cause the defendant to suffer an undue hardship." *Crosby v. Stew Leonard's Yonkers LLC*, 695 F. Supp. 3d 551, 567 (S.D.N.Y. 2023) (cleaned up); *Wright v. New York State Department of Corrections*, 831 F.3d 64, 76 (2d Cir. 2016).

---

[10] The amended complaint alleges that Brown "updated" her ergonomic equipment request to a work from home request. Doc. 53 at 102. But Brown does not make any other allegations about the original ergonomic equipment request.

Defendants argue that Brown fails to show that she was denied reasonable accommodation because:  (1) the June 12, 2022 work from home request for her PTSD was denied because it implicated the essential functions of her job; (2) her seat change request based on the burning sensation she was experiencing was granted; and (3) the July 20, 2022 FMLA request was granted.  Doc. 71 at 24.

The Court analyzes the June 12, 2022 remote work request and July 20, 2022 intermittent FMLA leave request together because both requests were based on Brown's injury caused by the stabbing incident and were close in time.  Doc. 53 at 65, 103.  As Defendants acknowledge, the remote work request was denied.  Doc. 57 at 24.  However, contrary to Defendants' assertion, the 2022 FMLA request was also denied.[11]  Doc. 53 at 103.[12]  The Court has determined that Brown has plausibly alleged that she was disabled within the meaning of the NYSHRL.  The accommodation requests clearly put the HRA on notice of Brown's disability.  The only issue remaining is whether she could perform the essential functions of her job with a reasonable accommodation.  Defendants argue that Brown fails to establish this element.  The Court disagrees.

What are the essential functions of a job depend on the totality of the circumstances and require fact intensive analysis.  *Cangro v. New York City Department of Finance*, No. 23-cv-10097, 2024 WL 3833971, at *5 (S.D.N.Y. Aug. 14, 2024).  Thus,

---

[11] The complaint alleges that Brown's intermittent FMLA request on June 12, 2022 was denied and her 2024 long-term FMLA leave request was granted for limited period.  Doc. 53 at 103.

[12] Although the intermittent FMLA request was denied because Brown was injured on the job, the request put the HRA on notice of Brown's disability and thus triggered a responsibility to engage in an interactive process to assess how Brown's disability can be reasonably accommodated.  *See Thomson v. Odyssey House*, No. 14-cv-3857 (MKB), 2015 WL 5561209, at *19 (E.D.N.Y. Sept. 21, 2015), *aff'd*, 652 F. App'x 44 (2d Cir. 2016) ("[t]he NYSHRL . . . require[s] that an employer engage a disabled employee in a good-faith interactive process to identify what reasonable accommodations are appropriate," and failure to do so might give rise to an failure to accommodate claim); *Desiderio v. Hudson Technologies, Inc.*, No. 22-cv-00541 (ER), 2024 WL 4026260, at *15 (S.D.N.Y. Sept. 3, 2024) (plaintiff's FMLA request put the employer on notice of her disability), *on reconsideration in part*, No. 22-cv-00541 (ER), 2025 WL 1285278 (S.D.N.Y. May 2, 2025).

24

the nature of a job's essential functions is often "ill-suited for resolution on a motion to dismiss." *Schwartz v. Middletown City School District*, No. 23-cv-1248 (KMK), 2024 WL 1257095, at *4 (S.D.N.Y. Mar. 25, 2024); *Crosby*, 695 F. Supp. 3d at 570. But even at this stage, a plaintiff still bears the initial burden to show that an accommodation that permits her to perform the essential functions of her job exists. *Crosby*, 695 F. Supp. 3d at 570.

Brown meets this burden. Her work involves front desk customer service, which requires in-person interaction, *and* back-office client benefits processing, which does not require in-person interaction. Doc. 53 at 11. In June 2023, Brown was selected to be a part of a pilot program which allows employees to work from home two days a week, showing that at least a part of Brown's job could be performed remotely. *Id*. at 101. Although the major part of Brown's job in 2018 was front-desk customer service, various staff switched from front desk to solely processing client benefits in the back office. *Id*. at 11. In addition, Brown only requested to work remotely for a limited period. *Id*. at 65. Thus, Brown meets her initial burden to establish the existence of a reasonable accommodation. *See e.g.*, *Schwartz*, 2024 WL 1257095, at *5 (finding that plaintiff, a teacher, met his initial burden to show that remote work was a reasonable accommodation at motion to dismiss stage, when the job's essential functions encompassed a variety of tasks, including both in-person and remote ones and two coworkers only did tasks that could be performed remotely); *Crosby*, 695 F. Supp. 3d at 569-70 (finding that the plaintiff, whose responsibility included maintaining the security of a store premise, met his burden to demonstrate that remote work was a reasonable accommodation at the motion to dismiss stage because he alleged at least one specific example of him working from home during his employment). Moreover, by pointing out that Brown's work involves in-person interaction, Defendants fail to establish that the

proposed accommodation will cause the HRA undue hardship at this juncture.[13] Accordingly, Brown plausibly states that the HRA failed to accommodate her disability.

Defendants do not address the HRA's denial of granting Brown long-term leave, but the Court concludes that to the extent that Brown alleges failure to accommodate based on this denial, she fails to state the claim. Brown does not plausibly allege that she was able to perform the essential functions of her job with the accommodation. To be considered reasonable, a leave of absence must enable the employee to perform the essential functions of her job upon return. *See Graves v. Finch Pruyn & Co.*, 353 F. App'x 558, 560 (2d Cir. 2009) (discussing reasonable leave of absence under the ADA). Indefinite leave is not considered a reasonable accommodation even under the NYSHRL standard. *Vangas v. Montefiore Medical Center*, 6 F. Supp. 3d 400, 414 (S.D.N.Y. 2014); *Romanello v. Intesa Sanpaolo, S.p.A.*, 22 N.Y.3d 881, 884 (2013). Here, Brown alleges that she was unable to work after October 16, 2023 and, in fact, has not worked since then. Doc. 53 at 100, 104. She made such indication to the HRA too. *Id*. at 100. She does not allege that she informed the HRA that she intended to return to work when she submitted the long-term leave request. Thus, she fails to plausibly show that the requested leave would enable her to perform the essential functions of her job upon her return and fails to state a failure to accommodate claim based on the HRA's denial of a longer leave.

Accordingly, Defendants' motion to dismiss the failure to accommodate claim is denied.

---

[13] The case cited by Defendants, *Wallace v. Wormuth*, No. 18-cv-6525 (RA), 2022 WL 993064 (S.D.N.Y. Mar. 31, 2022), is inapposite. Although *Wallace* holds that a reasonable accommodation cannot include the elimination of an essential job function and determines remote work was unreasonable for the plaintiff, it determined what the essential functions are with the benefit of discovery at motion for summary judgment stage. *Id*. at *12.

    *5.  Retaliation*

To prevail over a retaliation claim pursuant to Title VII or the NYSHRL, a plaintiff must establish that:  (1) she has engaged in a protected activity under the statute; (2) her employer was aware that she participated in such activity; (3) she suffered an adverse employment action based upon her activity; and (4) there is a causal connection between the protected activity and the adverse action.  *Kirkland-Hudson v. Mount Vernon City School District*, 665 F. Supp. 3d 412, 459 (S.D.N.Y. 2023).  In the context of unlawful retaliation, an adverse employment action is one which might have deterred a reasonable worker from making or supporting a charge of discrimination.  *Arroyave v. Universal Remote Control, Inc.*, No. 20-cv-8040 (VB), 2023 WL 5983941, at *11 (S.D.N.Y. Sept. 14, 2023); *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).  To establish a causal connection pursuant to Title VII, although a plaintiff does not need to show that retaliation was the only cause of the adverse employment action, she must plausibly allege that retaliation was a "but-for" cause.  *Vega*, 801 F.3d at 91.  But the threshold for establishing plausible but-for causation at motion to dismiss stage is low and can be inferred through temporal proximity.  *Supino v. SUNY Downstate Medical Center*, No. 19-cv-1315 (ENV) (VMS), 2021 WL 4205181, at *10 (E.D.N.Y. Mar. 15, 2021); *Kalarickal v. McDonough*, No. 20-cv-10249 (DLC), 2021 WL 5112907, at *5 (S.D.N.Y. Nov. 3, 2021).

    *a.  Title VII*

Brown's EEOC complaint for race discrimination constitutes a protected activity pursuant to Title VII.  *See Sullivan v. Creedmoor Psychiatric Center*, No. 22-cv-3420 (RPK) (LB), 2023 WL 6390165, at *7 (E.D.N.Y. Sept. 30, 2023).  Although as discussed above, the Court finds that Brown fails to state a race discrimination claim, a retaliation claim does not need to be premised on a valid discrimination claim.  *Eldaghar v. City of New York Department of Citywide Administrative Services*, No. 02-cv-9151 (KMW) (HBP), 2008 WL 2971467, at *11 (S.D.N.Y. July 31, 2008).  Brown filed her first EEOC

charge on March 30, 2023.  Doc. 68 at 4.  On May 15, 2023, approximately two months later, she was put on a termination process and went through an OATH trial.  *Id*. at 103. Although in October 2023, the OATH judge eventually decided that Brown should not be terminated, putting Brown on a termination process and making her go through the OATH trial constitutes an adverse employment action because it can deter a reasonable worker from making a charge of discrimination.  *See e.g.*, *Mauze v. CBS Corp.*, No. 15-cv-4905 (RJD) (SLT), 2019 WL 8137641, at *4 (E.D.N.Y. Jan. 23, 2019) (holding that a formal reprimand can be an adverse employment action); *Thomas v. iStar Financial, Inc.*, 438 F. Supp. 2d 348, 366 (S.D.N.Y. 2006), *aff'd*, 629 F.3d 276 (2d Cir. 2010) ("termination is clearly a materially adverse action").  Brown plausibly establishes a causal link between the adverse employment action and the protected activity through temporal proximity because there was only a two-month gap between the two events. *See e.g.*, *Vega v. Hempstead Union Free School District*, 801 F.3d 72, 92 (2d Cir. 2015) (holding that temporal proximity established causal connection when retaliation occurred three months after the protected activity); *Conforti v. Sunbelt Rentals, Inc.*, 201 F. Supp. 3d 278, 303 (E.D.N.Y. 2016) (finding the same for a two-month gap).

　　b.  *NYSHRL*

To the extent that Brown alleges a retaliation claim based on her accommodation requests for her disabilities, courts have held that making a request for reasonable accommodation is not a protected activity under the NYSHRL.  *Medina v. AAM 15 Mgmt. LLC*, 750 F. Supp. 3d 332, 346 (S.D.N.Y. 2024); *Witchard v. Montefiore Medical Center*, 103 A.D.3d 596, 596 (1st Dep't 2013).  But Brown plausibly states a retaliation claim under the NYSHRL based on her EEOC charge for the same reasons discussed above.

6. *Hostile Work Environment*

a. *Title VII*

To state a claim for hostile work environment pursuant to Title VII, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320–21. Courts look to "the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance." *Maron v. Legal Aid Society*, 605 F. Supp. 3d 547, 561 (S.D.N.Y. 2022).

Brown fails to state a hostile work environment claim under Title VII. "[F]or racist comments, slurs, and jokes to constitute a hostile work environment, there generally must be more than a few isolated incidents of racial enmity." *Harge v. City of New York*, No. 21-2293, 2022 WL 17481819, at *2 (2d Cir. Dec. 7, 2022) (alterations in original). Unfriendly reactions of coworkers, such as impatient and harsh tones, deliberate distancing, wrongful discipline, change of schedule, also do not support a hostile work environment claim. *Littlejohn*, 795 F.3d at 321. The conduct underlying Brown's hostile work environment claim was mostly petty, for example: she alleges that coworkers stared directly at her, raised their voice when they spoke to her, and made angry facial expressions towards her, Doc. 53 at 11, 15; a tall coworker once stood so close to Brown's chair that she was almost standing over Brown's head, *Id*. at 58; another coworker offered Brown candy every day for a whole month although she declined every time, *Id*. at 68. Although Brown also alleges that her coworker talked about her ethnicity with her and falsely accused her of sexual harassment, as discussed above, these two isolated incidents do not plausibly support a claim of hostile work environment. Accordingly, Brown's hostile work environment claim pursuant to Title VII is dismissed.

*b.  NYSHRL*

To state a hostile work environment claim under the NYSHRL, a plaintiff must establish that she was "subjected to inferior terms, conditions, or privileges of employment because of [her] membership in one or more protected categories." *Garrison v. American Sugar Refining, Inc.*, 789 F. Supp. 3d 291, 312 (S.D.N.Y. 2025). "Nevertheless, a NYSHRL hostile work environment claim will not succeed if the offending actions are no more than petty slights or trivial inconveniences." *Dixon v. City of New York*, No. 23-cv-8941 (JGK), 2025 WL 50140, at *13 (S.D.N.Y. Jan. 7, 2025).

In the present case, as discussed above, Brown does not plausibly allege that she was treated less well than coworkers outside her protected class. Accordingly, she fails to plausibly plead a hostile work environment claim pursuant to the NYSHRL. *See Dixon*, 2025 WL 50140, at *14 (dismissing the NYSHRL claim because the plaintiff failed to allege that she was treated less well because of her disability, although she plausibly stated a failure to accommodate claim).

**E.  Individual Liability**

There is no individual liability under Title VII. *Little v. City of New York Department of Finance*, No. 20-cv-1979 (RPK) (MMH), 2022 WL 4539574, at *3 (E.D.N.Y. Sept. 28, 2022); *Schiano v. Quality Payroll Systems Inc.*, 445 F.3d 597, 608 (2d Cir. 2006). The NYSHRL, on the other hand, holds individuals liable for discrimination under either a direct liability theory or an aiding and abetting theory. *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 365–67 (S.D.N.Y. 2012); N.Y. Exec. Law § 296(1), 296(6). Direct individual liability is limited to employers—"individuals with ownership interest or supervisors, who themselves, have the authority to hire and fire employees." *Malena*, 886 F. Supp. 2d at 365–66. An individual is not considered as an employer simply for being a supervisor of the plaintiff. *See e.g.*, *Pacheco v. Comprehensive Pharmacy Services*, No. 12 -cv-1606 (AJN), 2013 WL 6087382, at *4, *18 (S.D.N.Y. Nov. 19, 2013) (holding that the individual defendant was not an employer

30

within the meaning of the NYSHRL although he was a supervisor of the plaintiff). Brown fails to allege that any of the individual defendants is an employer within the meaning of the NYSHRL.

To state an aiding and abetting claim, the plaintiff must allege that defendant actually participated in the conduct giving rise to a discrimination claim. *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004); *Farmer v. Shake Shack Enterprises, LLC*, 473 F. Supp. 3d 309, 337 (S.D.N.Y. 2020). However, the plaintiff must first establish the liability of the employer/principal before accessorial liability can be found as to an alleged aider and abettor. *DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999); *Galanis v. Harmonie Club of The City of New York*, No. 13-cv-4344 (LTS) (AJP), 2014 WL 101670, at *8 (S.D.N.Y. Jan. 10, 2014). The Court has found that Brown plausibly states a retaliation and failure to accommodate claim. But she does not allege any individual defendants directly participated in the retaliation or the failure to accommodate.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. Specifically:

- Brown's claims against the individual defendants; the FMLA retaliation claim; the sex and race discrimination claims; the ADA claims; and the hostile work environment claims are dismissed;

- Brown's FMLA interference claim; failure to accommodate claims against the HRA pursuant to the NYSHRL; and retaliation claims against the HRA pursuant to Title VII and the NYSHRL are not dismissed.

The parties are directed to appear for a status conference on April 21, 2026 at 11:00 a.m. in Courtroom 619 of the Thurgood Marshall United States Courthouse, 40

31

32

Foley Square, New York, NY 10007.  The Clerk of Court is respectfully directed to

terminate the motion, Doc. 70.


It is SO ORDERED.


Dated:   March 31, 2026
         New York, New York

_____
         EDGARDO RAMOS, U.S.D.J.

32